2016 IL App (1st) 150583
No. 1-15-0583
December 29, 2016
Modified February 28, 2017

SECOND DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, ) | | Appeal from the Circuit Court |
| | ) | Of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | No. 97 CR 16984 |
| v. | ) | |
| | ) | |
| JAIME HAUAD, | ) | The Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE NEVILLE delivered the judgment of the court, with opinion.
Justices Pierce and Mason concurred in the judgment and opinion.

**OPINION**

¶ 1    A jury found Jaime Hauad guilty of two murders and an aggravated battery with a firearm. In a proposed supplement to a successive postconviction petition, Hauad alleged that new evidence showed that (1) the trial court should have barred the prosecution from presenting testimony about statements Hauad allegedly made while in police custody, (2) the prosecution withheld evidence that would have substantially impeached a key prosecution

witness, and (3) Hauad did not commit the offenses. The trial court denied Hauad's motion for leave to supplement the successive postconviction petition. We hold that the report of the Illinois Torture Inquiry and Relief Commission (Torture Commission) constitutes only a reassessment of evidence available to Hauad before he filed his prior postconviction petitions, and thus it does not qualify as new evidence. The new evidence about a key witness does not show that she committed perjury. Because Hauad has not shown that the evidence would probably have changed the result of the trial, he has not sufficiently shown prejudice needed to add the allegation to the successive postconviction petition. Hauad has not adequately explained his failure to present the evidence of actual innocence in support of his prior postconviction petitions. Accordingly, we affirm the trial court's judgment.

¶ 2                                    BACKGROUND

¶ 3        On May 21, 1997, Miguel Salgado, Jose Morales, and Jason Goral, members of the Maniac Latin Disciples street gang, went to a bar at the corner of Kedzie Avenue and George Street in Chicago. They left the bar together around 1 a.m. Someone shot them as they walked on George Street. Morales and Goral died from the gunshot wounds. Salgado, shot in the shoulder, walked south to a nearby convenience store, where he called his mother before collapsing. A police officer found Salgado in the store and took him to a hospital.

¶ 4        Around 3 a.m. on May 22, 1997, about two hours after the shooting, Officer Julie Wlezien arrested Hauad for a traffic offense committed not far from the scene of the shooting. Later that morning, another officer spoke to a woman who lived very close to the scene of the shooting. The woman, who identified herself as Luz Contreras, told police that after she heard gunshots, she went to the window and saw a man walking away with a gun in

2

his hand. Police showed her some books of photographs of known gang members. She could not identify any of the men pictured as the man she saw after the shooting. On May 24, 1997, police showed Contreras a photo lineup with only a few photos. Contreras picked Hauad's photo as a picture of the man she saw walking away from the scene of the shooting.

¶ 5 Police brought Hauad to the police station for questioning on May 26, 1997. Contreras identified Hauad in a lineup on May 27. Salgado viewed a lineup and identified Hauad as a person he had seen in the bar not long before the shootings occurred. Prosecutors charged Hauad with two counts of first degree murder and one count of aggravated battery with a firearm.

¶ 6                                                     Trial

¶ 7 Hauad moved to bar the prosecution from presenting testimony about statements he allegedly made to police after the police picked him up for questioning. At the hearing on the motion, Hauad testified that Detective Daniel Engel and another officer hit him and threatened him while he was in custody. The trial court denied Hauad's motion.

¶ 8 At the trial, held in 1999, Officer Cesar Echeverria testified as a gang specialist, to help establish the motive for the crime. Echeverria said that in 1997 the Maniac Latin Disciples included several different factions, identified primarily by areas in which members lived. The factions were struggling for power. According to Echeverria, Hauad and a man Echeverria knew as Cave Man belonged to the Kedzie and Barry faction. David Ruiz and another man, known as Little Bum, belonged to the Rockwell Potomac faction, which had a friendly relationship with the Kedzie and Barry faction, but stood opposed to the Tallman Wabansia faction and its ally, the Kenneth and Belden faction.

¶ 9      Salgado testified that he belonged to the Kenneth and Belden faction, while Morales and Goral belonged to the Tallman Wabansia faction. Salgado saw Hauad in the bar. Salgado saw Morales get into an argument with Little Bum of Rockwell Potomac in the bar. After the argument, Little Bum spoke with Hauad, a member of the Kedzie and Barry faction allied with Rockwell Potomac and opposed to Tallman Wabansia. Hauad left the bar around 12:30 a.m. on May 22, 1997.

¶ 10     Salgado testified that around 1 a.m., as Salgado and his friends walked on George Street, Salgado heard gunshots, and he and his friends hit the ground. Salgado saw that both of his friends had been shot. Salgado went back to the bar first, but no one there would help him. Salgado returned to the crime scene before heading to the convenience store. On cross-examination, Salgado said he heard the shooter run north from the scene, across George Street, before Salgado got off the ground.

¶ 11     The officer who came to the convenience store testified that Salgado first told him that he did not see anything, and he had no idea who shot him and his friends. Salgado then told the officer he saw several men dressed in black get out of a small maroon car and walk towards the victims while shooting.

¶ 12     Ballistic evidence showed that all bullets at the scene, including the fatal bullets, came from a single gun.

¶ 13     Contreras testified that she was watching television around 1 a.m. on May 22, 1997, when she heard gunshots. She went to the window and saw a man she did not know standing over the victims, then walking on George Street, carrying a gun. The man turned south. She

saw his face and the tattoo on his arm clearly as he walked past her window. She identified Hauad in court as the man she saw walk away from the crime scene.

¶ 14   Officer Wlezien testified that she responded to a call about the shooting. Around 1:30 a.m., she saw Hauad, whom she knew from the area, approach the crime scene. Later that morning, around 3 a.m., she stopped Hauad after he drove past a stop sign without stopping. She asked him why he had come to Kedzie and George at 1:30. Hauad answered that he wanted "to see if any of his fellow gang bangers got shot."

¶ 15   Detective Engel testified that, under questioning on May 27, 1997, Hauad said that an officer arrested him on May 21, 1997, around noon, for a traffic violation. Hauad said that because of an outstanding warrant, police kept Hauad in custody from May 21 until the morning of May 24, 1997, and therefore he had been in police custody on May 22, 1997, at the time of the shooting. An assistant State's Attorney testified that Hauad gave her the same alibi. Police records, especially Wlezien's record of her arrest of Hauad at 3 a.m. on May 22, 1997, proved the alibi false.

¶ 16   Hauad did not testify. The jury found Hauad guilty on all three counts. The trial court denied Hauad's posttrial motion and sentenced him to two concurrent terms of life in prison for the two murders, plus 15 years for aggravated battery with a firearm. The appellate court affirmed the convictions and sentences. *People v. Hauad*, No. 1-99-2817 (2000) (unpublished order under Supreme Court Rule 23).

¶ 17                              First Postconviction Petition

¶ 18   Hauad filed a postconviction petition in 2001, arguing that he received ineffective assistance of trial counsel and the prosecution did not present sufficient evidence to prove

5

him guilty. He attached police reports showing that police spoke to a witness who did not testify and the witness said that, after the shooting, he saw a white van and a small red car, possibly a Toyota, driving north, away from the crime scene, at a high rate of speed. Another police report said that Officer "Joseph MIEDZIANOWSKI had developed information from an anonymous street source that a Latin Disciple by the nickname of 'Red' fit the description of the offender. The source also related that there was internal strife between the various faction[s] of Maniac Latin Disciples[,] and that the three victims could have been shot by another member of the MLD street gang." Hauad alleged:

> "Joseph Miedzianowski is a <u>corrupt cop</u> that worked out of Area Five Violent Crimes police station as far as the federal government is concerned as he was indicted for allegedly committing various federal offenses.
>
> *** A well-documented history of frame-ups happening at Area Five Violent Crimes police station involving murder cases militates in favor of allowing the petitioner to conduct discovery to further support this claim." (Emphasis in original.)

¶ 19     The trial court dismissed the postconviction petition as frivolous. The appellate court affirmed the trial court's judgment. *People v. Hauad*, No. 1-01-2070 (2002) (unpublished order under Supreme Court Rule 23).

¶ 20                                   Habeas Corpus Petition

¶ 21     In 2003, Hauad filed a petition for writ of habeas corpus in federal court, again claiming ineffective assistance of trial counsel, and adding claims for ineffective assistance of appellate counsel, improper jury instructions, and actual innocence. Hauad supported his

6

innocence claim with an affidavit from Salgado, who said he did not see Hauad at any time on the night of the murders, and in particular he did not see Hauad in the bar. Thus, Salgado admitted that he committed perjury in his testimony against Hauad. The federal court dismissed the habeas petition without prejudice, so that Hauad could exhaust state remedies for his actual innocence claim.

¶ 22                                    Second Postconviction Petition

¶ 23         In January 2005, Hauad sought leave to file a successive postconviction petition, again alleging ineffective assistance of counsel and actual innocence based on Salgado's recantation. He added allegations that during questioning, police threatened to cut off his toes. He supported the allegation with photographs of his sneakers, shown in the police station intact, and later shown in photographs taken in the police station with the toes of the sneakers cut off. Javier DeJesus, who was in custody at the police station at the time police questioned Hauad, signed an affidavit stating that Hauad showed him the sneakers after police cut them, and DeJesus took the cut sneakers to Hauad's mother when police released DeJesus. The trial court denied Hauad leave to file the successive postconviction petition and the appellate court affirmed. *People v. Hauad*, No. 1-05-1287 (2006) (unpublished order under Supreme Court Rule 23).

¶ 24                                    Third Postconviction Petition

¶ 25         Hauad filed a motion for leave to file another postconviction petition on August 17, 2005. He claimed only that the trial court erred when it gave an improper instruction concerning eyewitness identifications. The trial court denied the motion for leave to file the successive

postconviction petition, finding the claim procedurally barred. The appellate court affirmed. *People v. Hauad*, No. 1-05-3896 (2007) (unpublished order under Supreme Court Rule 23).

¶ 26                                   Fourth Postconviction Petition

¶ 27       Hauad later filed another motion for leave to file a successive postconviction petition, arguing that the mandatory life sentences the trial court imposed violated the eighth amendment because Hauad was only 17 years old at the time of the shooting. Hauad based his argument on *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012). We will refer to this petition as the *Miller* petition.

¶ 28       On July 22, 2014, with the motion to file the *Miller* petition still before the court, Hauad filed a motion for leave to file a supplement to the *Miller* petition. He attached the proposed supplement to the motion for leave to file. In this appeal, we address the motion for leave to supplement the *Miller* petition, and the proposed supplement to the *Miller* petition. The appeal does not directly concern the *Miller* petition itself.

¶ 29       In the proposed supplement to the *Miller* petition, Hauad argued that the trial court should have granted his motion to bar prosecution witnesses from testifying about any statements Hauad allegedly made in custody; the prosecution denied him his right to confront his accuser by failing to give him accurate and complete information about Luz Contreras; and new evidence shows that Hauad did not commit the murders or the aggravated battery.

¶ 30       Hauad supported his proposed supplement with many documents. He presented the police reports that showed (1) a witness told police that shortly after the shooting, he saw a white van and a red car, moving fast, leaving the crime scene, and (2) Contreras initially told police she saw two men lying on the ground and a third man standing over them, holding a gun,

wearing a t-shirt with a Marlboro logo. Hauad's proposed petition explained the significance of the police reports. When police arrested Hauad at 3 a.m. on May 22, 1997, he had on a shirt that did not have any markings similar to the Marlboro logo. Immediately after the shooting, before the shooter left the area, three men lay on the ground. Salgado testified that he got up only after he heard the shooter run off to the north. Contreras swore that the man she saw walked off to the south. Hauad argued that the police report strongly suggests that Contreras did not see the shooter at the scene. She probably saw Salgado walking south away from the scene, somewhat after the shooter ran off to the north. The report of a witness who saw a red car speeding off north further confirms Salgado's testimony about the shooter's escape and casts further doubt on Contreras's identification of Hauad as the man she saw after the shooting. Hauad presented photographs of Hauad and Salgado, showing that they resembled each other.

¶ 31    Next, Hauad included a letter dated January 17, 2013, from an assistant United States attorney to Hauad's attorney, concerning an FBI interview of a member of the Maniac Latin Disciples in 2001. The assistant United States attorney said that, according to documents he reviewed, David Hernandez told the FBI agent that Hernandez went to the bar at Kedzie and George on May 21, 1997, and he saw Morales, Goral, and Salgado in the bar. Nick Maropoulos came into the bar and showed Hernandez a gun. Maropoulos said to Hernandez, "I'm going to take care of my business." Hernandez left the bar and got into a car. He reached the intersection of Kedzie and George, where he saw Maropoulos shoot Morales, Goral, and Salgado.

¶ 32    David Ruiz, also a member of the Maniac Latin Disciples, provided an affidavit dated April 18, 2012, in which he said that a few weeks after the shooting, Slim Moralez, the chief of the west side Maniac Latin Disciples, told Ruiz that he "ordered the shooting of Jose Morales, Jason Goral, and Miguel Salgado." Moralez told Ruiz that Nick Maropoulos carried out the order, and Hauad did not participate.

¶ 33    Hauad also presented a towing record, which showed that as of 2005, Nicholas Maropoulos owned a 1988 maroon Toyota, with vehicle identification number JT2EL31D1J0296771. A document dated September 21, 2009, bearing a certification from the Illinois Secretary of State, includes the following:

> "VIN: JT2EL31D1J0296771 ***
>
> *** 1988 TOYOTA TERCEL COUPE
>
> * * *
>
> CURR #: X7156091032 6 400 06-05-07
>
> SURR #: LEGAL AO
>
> PREV #: 7062079045 7 405 03-03-97"

¶ 34    Hauad claims that this document proves that Maropoulos owned the same maroon Toyota since March 1997, two months before the murders. Hauad did not present any witness to explain the document.

¶ 35    Hauad also attached three handwritten letters signed "Nickk" and "Nick Dog," one dated February 26, 1999, one from November 6, 2000, and one with no date. Hauad swore in an

affidavit that the letters came from Maropoulos in 1999 and 2000. In the first letter, Maropoulos said:

"I was su[r]prised *** that you wanted me to write you <u>considering</u>! *** I could apologize for everything but I guess it wouldn't help, any. I could imagine what you think of me and I can't change that."

¶ 36        From the second letter:

"After that shit happened all the fellas told me not to go see you including Slim and shit I practically got locked up not even 2 months after you. So all that shit about why I didn't look out for you and your family lets be real, I didn't even have the chance! It would be different if I was out there in the world but I'm not so you have to be patient."

¶ 37        From the undated letter:

"The other thing you said I was bogish about was that I was bragging about '_____'. *** I am <u>never ever</u> smiling about you being in your position. Another thing you said is that I never looked out for you or your family. *** What it boils down to is that a n*** took care of some nation business and you got caught up for some shit you didn't even do or know about."

¶ 38        Hauad also again presented Salgado's affidavit recanting his trial testimony. Hauad, in his own affidavit, said that Officer Echeverria frequently harassed Hauad on the street, and said "I'm coming to get you when you're seventeen." After the shooting, Echeverria said, "I told you I would come get you when you're 17, and now you're going down for two murders." Hauad said that during the interrogation on May 26 and May 27, 1997, police beat

11

him, slapped him, and "held [him] down while a paper cutter was used to cut off the edge of his shoes, with threats to cut off his toes." Hauad claimed that police and the assistant State's Attorney who testified fabricated the testimony about the false alibi, and he never said that police had him in custody at the time of the shooting. Hauad added that Detective Engel and Officers Hector Vergara and Joseph Miedzianowski "took turns smacking and choking [him], and yelling that if [he] did not sign a confession they would continue to beat [him]."

¶ 39    Hauad had previously sent copies of the exhibits attached to the proposed supplement to the Torture Commission. The Torture Commission sent a report to the Cook County State's Attorney and to the chief of the Conviction Integrity Unit of the State's Attorney's Office. In the report, dated June 18, 2014, the Torture Commission summarized the evidence against Hauad and Hauad's evidence in support of his claims. The Torture Commission said:

"The photographic evidence of damage to Hauad's shoes as of the time of the second lineup is compelling. It is very unlikely that Hauad had access to a knife or any other tool that could have cut the tips of his shoes.

(ii) The total evidence against Hauad was not strong.

(iii) There is some evidence that the crime may have been committed by Nick Mar[o]poulos ***.

(iii) [*sic*] While it is possible that Hauad told police officers on May 26 that he was in jail at the time of the shooting on May 22, it is an unlikely alibi since (a) it was within the prior week, (b) Hauad would know there were records disproving it, and (c) Hauad had been arrested on the morning of May 22, within hours *after* the shooting, by an officer he knew.

(iv) While there was ample evidence placing Hauad in the neighborhood around the time of the shooting, Ms. Contreras, the only person who said Hauad had a gun, did not cooperate with detectives the first time she was interviewed.

(v) The descriptions of the events surrounding the shooting by the surviving victim, Miguel Salgado, have been wildly inconsistent.

(vi) One of the detectives who Hauad claims beat him was Joseph Miedzianowski. Miedzianowski was arrested in December 1998 and convicted on federal racketeering and drug charges. Information from Miedzianowski's prosecution reportedly included descriptions of Miedzianowski torturing suspects, planting evidence, fixing cases, taking protection money from gang leaders, and cooperating with leaders of certain gangs, including the Maniac Latin Disciples.

 *** On balance, the Commission concludes that there is substantial evidence that Hauad's shoes were intentionally cut by police officers while he was in police custody, in an attempt to coerce a confession, and that the case merits judicial review."

¶ 40    However, the Torture Commission also noted that none of the officers involved previously served as a subordinate to Jon Burge, and therefore the Torture Commission lacked statutory authority to refer the case to the circuit court. Instead, the Torture Commission could only recommend that the State's Attorney further review the case.

¶ 41    In addition to the evidence presented to the Torture Commission, Hauad attached to his proposed supplement to the successive postconviction petition two additional affidavits. Miguel Morales said in his affidavit, dated August 14, 2012, that he spoke with Salgado

before Hauad's trial in 1999, and Salgado said he "fear[ed] that he would be forced to testify against Jaime Hauad, who Miguel Salgado knew to be innocent." According to Morales, Salgado said "he was only testifying under threat or pressure by the 25th District police/detectives. Threatening to deport him back to Mexico since Miguel Salgado didn't have any papers to be in the U.S."

¶ 42    The second affidavit came from Julie Pabarja, who worked as a researcher for a law firm. A lawyer asked Pabarja to locate Luz Imelda Contreras, using a California state identification card with her name, photograph, and date of birth. Pabarja said:

"Using the given information, I ran various searches on premium public records databases including Accurint, TLO, and Westlaw ***.

*** Accurint and TLO reported that a person with this name lived in East Chicago, IN, in 2013. The reports also reflected that there were other addresses within this area associated with Contreras from 2003-2013. There were 2 social security numbers found in these reports—[xxx-xx]-4336 which was issued in Illinois between 4/2/1994 and 11/30/1995 and [xxx-xx]-9286.

*** When searching for 'Contreras' and '3151 W. George' simultaneously, Accurint brought up 2 reports with Luz I Contreras linked to them. There were 2 different social security numbers listed in these reports—[xxx-xx]-8973 and [xxx-xx]-8975.

*** Using the Social Security Number Alert file on Westlaw which provides the best known name and address associated with a social security number, I ran each

14

social security number[ ] found in the Accurint and TLO reports. My results are listed below:

[xxx-xx]-9286 was not found.

[xxx-xx]-4336 was not found.

[xxx-xx]-8975 was connected to Leslia Madrigal Lazaro.

[xxx-xx]-8973 was connected to Lara Perez.

*** I also searched these social security numbers on TLO and got the following results:

[xxx-xx]-8975 was connected to Leslia Madrigal.

[xxx-xx]-4336 was not found.

[xxx-xx]-8973 was connected to Leslie Lara, Elaine Menke and Cesar Lima Hernandez.

[xxx-xx]-9286 was connected to Luz Imelda Contreras. The report stated this social security number was issued in South Carolina between 1934-1954.

***

*** TLOxp is an advanced product that is relatively new. [Pabarja's law firm] did not purchase access to TLOxp's databases until 2012.

*** [The law firm] first obtained access to Accurint in 2002."

¶ 43      Also, Hauad attached to the proposed supplement a request for information sent to the California Department of Motor Vehicles in March 2014, seeking the driver's license record for the license number a police officer wrote in the police report about his meeting with

Contreras. The California DMV returned a "Notice of Incomplete or Invalid Information Request," noting that the person requesting the driver's license record had not supplied sufficient information, and adding "The subject's driver license number came back not on file."

¶ 44    On January 6, 2015, the trial court read to the parties its ruling, denying the motion for leave to supplement the successive postconviction petition. At the conclusion of the ruling, Hauad's counsel pointed out that the court failed to address the *Miller* issue, which formed the basis for the successive postconviction petition. The court noted:

> "[Hauad] was given mandatory life for the murders. The Illinois Supreme Court said you can't do that. *** So come back for resentencing. It's not an issue whether [the motion to file the successive postconviction petition and the successive postconviction petition] has to be granted or not."

¶ 45    The court entered a written order denying Hauad leave to supplement the *Miller* petition, but no written order concerning the *Miller* petition itself. Hauad filed a notice of appeal on January 30, 2015.

¶ 46                                ANALYSIS

¶ 47                                Jurisdiction

¶ 48    After the hearing on January 6, 2015, the trial court entered a written order denying the motion for leave to supplement the *Miller* petition, but no written order concerning the *Miller* petition itself. The clerk entered into the record a notation, "Motion to file Successive PC pet. Denied BA 2/10/15." We find in the record no explicit notation concerning the *Miller* petition. However, Hauad's counsel provided a certified court record showing that the trial

16

court treated the case as though it granted Hauad leave to file the *Miller* petition, summarily granted the *Miller* petition on January 6, 2015, and continued the case for resentencing. Thus, the court finally disposed of the *Miller* petition orally (see *People v. Allen*, 71 Ill. 2d 378 (1978); *People v. Fikara*, 345 Ill. App. 3d 144, 151-52 (2003)), and finally disposed of the motion for leave to supplement the *Miller* petition by written order, on January 6, 2015. We find that the timely notice of appeal confers jurisdiction on this court. Ill. S. Ct. R. 606(b) (eff. Dec. 11, 2014).

¶ 49                                    Standard of Review

¶ 50        On appeal from a trial court's denial of leave to file a successive postconviction petition, this court evaluates each individual claim separately. *People v. Pitsonbarger*, 205 Ill. 2d 444, 463 (2002). Each claim must either meet the cause and prejudice test or, if the petitioner makes a claim of actual innocence, he must show that newly discovered evidence would probably change the result on retrial. *People v. Adams*, 2013 IL App (1st) 111081, ¶ 30. We review *de novo* the trial court's denial of leave to file each separate claim in the proposed supplement to the *Miller* petition. *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 25.

¶ 51        Hauad argues that the trial court should have allowed him to file his claims that (1) the use of an alleged false alibi made to police and an assistant State's Attorney violated his rights against self-incrimination; (2) the failure to provide relevant information about Contreras violated his right to confront his accusers; and (3) new evidence shows Hauad did not commit the offenses charged.

¶ 52                                         False Alibi

¶ 53        Hauad contends that the Torture Commission's report constitutes new evidence, showing

that the trial court erred when it allowed the prosecution to present evidence that Hauad gave

a false alibi during questioning at the police station. He had cause for not presenting the

report at trial, and for not appending it to prior postconviction petitions because the Torture

Commission had not made the report until June 2014. He also claims that he suffered

prejudice due to the unavailability of the report.

¶ 54        The Torture Commission concluded, "there is substantial evidence that Hauad's shoes

were intentionally cut by police officers while he was in police custody, in an attempt to

coerce a confession, and *** the case merits judicial review." However, the Torture

Commission based its conclusion on evidence Hauad presented to the trial court either in

pretrial proceedings or in postconviction proceedings, and on evidence available to Hauad

before 2005. The Torture Commission did not refer to any evidence from other sources.

Thus, the Torture Commission provides only a new assessment of previously available

evidence.

¶ 55        "[I]f the evidence was available at a prior posttrial proceeding, the evidence is *** not

newly discovered evidence." *People v. Snow*, 2012 IL App (4th) 110415, ¶ 21. In *People v.*

*Patterson*, 192 Ill. 2d 93 (2000), Patterson filed a postconviction petition in which he sought

to present the opinion of an expert who found that the evidence at trial supported Patterson's

claim that police coerced him to confess. Our supreme court said, "the expert's conclusions

do not rest on any evidence that was not available before defendant's trial. Consequently, we

are unable to conclude that the expert's opinion constitutes new evidence." *Patterson*, 192 Ill.

2d at 140. In accord with *Patterson*, we find that the Commission's conclusion does not qualify as new evidence that police tortured Hauad in an effort to coerce him to confess. Because Hauad has not presented new evidence to support his claim of coercion, the trial court correctly denied his request for leave to add the claim to his *Miller* petition.

¶ 56                                   Contreras

¶ 57      In 2014, Julie Pabarja requested public records to help her locate Contreras. Her search showed her that a person or persons using that name may have used several social security numbers that belonged to persons not named Luz Contreras. Hauad claims that Pabarja's affidavit shows:

> "[T]he State either knew o[r] should have known that Contreras supplied them with false information, and was required to disclose this to Mr. Hauad. *** Additionally, because Mr. Hauad was unaware that Contreras had provided false information about her identity, he could not question her about what this suggested in terms of her legal status and her susceptibility to police coercion. ***
>
>                                   * * *
>
> *** Mr. Hauad was prejudiced by the State's failure to disclose that she lied about her identity and was potentially in the U.S. without proper authorization. *** Even if the State was completely unaware of Contreras' false identity, the fact that Contreras gave false testimony about her identity under oath at trial violates Mr. Hauad's Sixth Amendment rights."

¶ 58       In his reply brief, Hauad asserts that "the identification card presented by this witness to the police in this case is now known to have been false or doctored."

¶ 59       We have searched the extensive record in this case and find only that the witness identified herself consistently as "Luz Contreras," and she said she lived at 3151 George Street. We find nothing in Pabarja's affidavit or other evidence that contradicts Contreras's testimony regarding her identity. We have not seen the identification card to which Hauad refers. We cannot conclude from the cited pages of the record, referring to an insufficient request for information sent to the California Department of Motor Vehicles, that Contreras used a doctored identification card or that she perjured herself when she gave her name and address.

¶ 60       Moreover, for new evidence to show prejudice for purposes of making the claim in a successive postconviction petition, "the evidence *** must be of such conclusive character that it will probably change the result on retrial." *People v. Orange*, 195 Ill. 2d 437, 450-51 (2001). Hauad argues that the evidence concerning Contreras shows that she came to the United States without proper authorization and that police used her vulnerability to pressure her to give the identification evidence that would allow them to clear the case. Hauad relies on innuendo, without any testimony that Contreras came to the United States illegally or that police threatened to deport her. Hauad has not even shown that the person who testified against him used the multiple social security numbers associated in some databases with her name. We cannot say that Pabarja's finding of multiple social security numbers has such conclusive character that it would probably change the result on retrial. We find that the claim as to evidence of Contreras's identity does not meet the cause and prejudice test, and

therefore the trial court correctly denied Hauad's request for leave to add the claim to his *Miller* petition.

¶ 61                                    Actual Innocence

¶ 62    "When a defendant claims actual innocence, the question is whether his motion and supporting documentation set forth a colorable claim; that is, whether they raise the probability that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence. [Citation.] The evidence supporting the claim of actual innocence must be (1) newly discovered; (2) material and not merely cumulative; and (3) of such conclusive character that it would probably change the result on retrial." *Adams*, 2013 IL App (1st) 111081, ¶ 30. Evidence counts as newly discovered only if the petitioner, acting with due diligence, could not have discovered it before he filed his previous postconviction petitions. *People v. Wideman*, 2016 IL App (1st) 123092, ¶¶ 57-59.

¶ 63    Hauad relies on seven pieces of evidence, mostly ones he presented to the Torture Commission, to support his claim of innocence. Hauad cites the letter from the assistant United States Attorney to Hauad's attorney. The assistant United States Attorney said he read documents summarizing an interview of David Hernandez, who, according to the documents, told an FBI agent that he saw Maropoulos shoot the victims. However, the FBI agent conducted the interview in 2001 and, according to the assistant United States Attorney, told Hauad's attorney in 2001 that Hernandez named Maropoulos as the shooter. Hauad does not explain how the statement can qualify as newly discovered evidence. Moreover, even if the FBI agent could testify about Hernandez's statement, the assistant United States Attorney's

21

letter does not qualify for admission into evidence under any exception to the hearsay rule. See Ill. R. Evid. 801 (eff. Oct. 15, 2015) Ill. Rs. Evid. 802, 804, 805 (eff. Jan. 1, 2011).

¶ 64    Hauad had received the letters from Maropoulos by 2001, so they do not qualify as newly discovered evidence. Hauad also has not explained why he could not have presented to the court with his 2005 postconviction petitions the towing document showing that, in 2005, Maropoulos owned a 1988 maroon Toyota. Because of the long gap between the time of the tow and the time of the offense, the document does not strongly support the inference that Maropoulos owned the red car some witnesses may have seen near the crime scene. This court would need a certified record naming Maropoulos as the vehicle's owner, and a witness to explain the document from the Secretary of State, before confidently concluding that Maropoulos owned a 1988 maroon Toyota in 1997.

¶ 65    Hauad has also failed to explain why he could not previously have obtained an affidavit from David Ruiz concerning the conversation Ruiz had with Slim Moralez in 1997, a few weeks after the shooting. Hauad does not explain why he could not have obtained the affidavit of Miguel Morales, concerning a conversation Miguel had with Salgado in 1999, before Hauad filed his prior postconviction petitions. Finally, the evidence casting doubt on Contreras's immigration status does not qualify as evidence that would likely change the result on retrial.

¶ 66    Applying the standards for assessing whether a court should grant a motion for leave to file a successive postconviction petition based on a claim of actual innocence and reviewing the record before us *de novo*, we find that the trial court correctly denied Hauad's motion. Accordingly, we affirm the trial court's judgment.

22

¶ 67                                        CONCLUSION

¶ 68        Hauad presented to the Torture Commission evidence he had previously presented in pretrial proceedings, at trial, and in support of prior postconviction petitions, along with evidence apparently available before Hauad filed his prior successive postconviction petition in 2005. The Torture Commission's reassessment of the previously available evidence does not constitute new evidence. The trial court correctly denied Hauad's request for leave to file a claim in a successive postconviction petition based on the Torture Commission's finding. The evidence that Contreras may have used several different social security numbers, numbers associated with names other than Luz Contreras, does not disprove any of her trial testimony, and it does not qualify as evidence that would probably change the result on retrial. Therefore, the trial court correctly denied Hauad's request for leave to file a claim in a successive postconviction petition based on evidence of the multiple social security numbers associated with the name Luz Contreras, and the multiple other names also associated with those social security numbers. Hauad based his claim of actual innocence primarily on evidence available before 2005, without explaining why he could not have presented the evidence to the court when he filed his successive postconviction petition in 2005. Accordingly, we affirm the trial court's judgment denying Hauad leave to file his proposed supplement to his successive postconviction petition.

¶ 69        We recognize that we can no longer dismiss as fanciful allegations of police misconduct and, in particular, allegations of the torture of suspects in custody. See Curtis Black, *How Chicago Tried To Cover Up a Police Execution*, Chicago Reporter (Nov. 24, 2015), http://chicagoreporter.com/how-chicago-tried-to-cover-up-a-police-execution/    (last visited

Nov. 1, 2016); Andrew Schroedter, *BGA Public Eye: City Pays a Price for Police Misconduct—$642 Million Since 2004*, Chicago Sun Times (Jan. 30, 2016, 6:45 p.m.), http://chicago.suntimes.com/news/bga-public-eye-city-pays-a-price-for-police-misconduct-642-million-since-2004/ (last visited Nov. 1, 2016). We have carefully examined the record in this case and conclude that it precludes the relief Hauad seeks. We encourage the State's Attorney and the Conviction Integrity Unit to heed the recommendation of the Torture Commission to further investigate the case and Hauad's claim that he was tortured while in police custody.

¶ 70      Affirmed.